AO 91 (rev.11/11) Criminal Complaint                                 AUTHORIZED AND APPROVED DATE:                    9-7-202

# United States District Court
### for the

| WESTERN | DISTRICT OF | OKLAHOMA |

| | |
|---|---|
| United States of America | ) |
| | ) |
| v. | ) |
| | ) |
| Cesar Alejandro Fonseca-Echavarria, | )   Case No:  M-21- 524 -STE |
| Jose Andres Fonseca-Echavarria, | ) |
|   a/k/a Jay, | ) |
|   a/k/a Pony, | ) |
|   a/k/a Andres, | ) |
| Juan Antonio Cervantes-Ontiveros, | ) |
|   a/k/a Juanito, | ) |
| Jerome Thor Campbell, | ) |
|   a/k/a Thor, | ) |
|   a/k/a Tulsa, | ) |
|   a/k/a Old School, | ) |
| Osvaldo Calvillo-Oropeza, | ) |
|   a/k/a Soldado, | ) |
| Felix Antonio Campa-Rios, | ) |
|   a/k/a Toro, | ) |
| Calista Charmaine Clark, | ) |
| Dante Maxey, | ) |
|   a/k/a Dean Mack, and | ) |
| Javion Jarrel Wisby. | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about March of 2020, and continuing thereafter until on or about April of 2021, in the Western District of

Oklahoma, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to possess with intent to distribute and to distribute controlled substances–namely methamphetamine, heroin, and fentanyl |

This criminal complaint is based on these facts:  See attached Affidavit of Special Agent Ryan Belcher, Homeland Security Investigations, which is incorporated and made a part hereof by reference.

☒ Continued on the attached sheet.

_____
*Complainant's signature*
RYAN BELCHER, Special Agent
Homeland Security Investigations

Sworn to before me and signed in my presence.

Date:  **Sep 8, 2021**

_____
*Judge's signature*

City and State: Oklahoma City, Oklahoma

SHON T. ERWIN, U.S. Magistrate Judge

*Printed name and title*

## WESTERN DISTRICT OF OKLAHOMA
## OKLAHOMA CITY, OKLAHOMA

**STATE OF OKLAHOMA** )
)
**COUNTY OF OKLAHOMA** )

### AFFIDAVIT

I, Ryan Belcher, a Special Agent of the Homeland Security Investigations (HSI), having been duly sworn, depose and state as follows:

1.     I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  I have been employed as a Special Agent since April 2015, and I am presently assigned to the HSI office in Oklahoma City, Oklahoma (hereinafter referred to as HSI Oklahoma City).  As a Special Agent, I am authorized to conduct criminal investigations of violations of the laws of the United States and to execute warrants issued under the authority of the United States.

2.     I have received approximately 24 weeks of specialized training at the Federal Law Enforcement Training Center in the enforcement of federal laws.  I have arrested, interviewed, and debriefed numerous individuals who have been involved with and have personal knowledge of smuggling goods into

1

the United States, aiding in unlawful importation, and the unlawful possession of firearms, as well as, the amassing, spending, converting, transporting, distributing, laundering, and concealing of proceeds from criminal activity. I have testified in judicial proceedings concerning the prosecution for violations of laws related to the smuggling of contraband and firearms. I have been the affiant of numerous federal search warrants. I have used these warrants to further criminal investigations.

3.     While employed by HSI, I have received training and been involved in a wide variety of investigations, including but not limited, to the following violations:   illegal immigration, human smuggling, drug trafficking and distribution, financial crimes, firearms smuggling, gang investigations and child exploitation. I have participated in investigations involving physical and electronic surveillance. I have testified in judicial proceedings concerning the prosecution for violations of laws related to the smuggling and trafficking of contraband, including controlled substances. I have been the affiant on numerous federal search warrants. I have coordinated the execution of search and arrest warrants, conducted physical and electronic surveillance, assisted controlled purchases, analyzed records documenting the purchase and sale of drugs, and spoken with informants and subjects, as well as other local and federal law-enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their

2

illegal drugs. Through my training and experience, I have become familiar with some of the manners in which illegal drugs are imported, distributed, and sold, as well as the methods used by drug distributors to disguise the source and nature of their profits.

4. This investigation is being conducted by Special Agents and Task Force Officers (TFOs) of HSI, the Oklahoma Bureau of Narcotics, the Oklahoma City Police Department (OCPD) and the United States Postal Service (USPS). During this investigation it was ascertained that the Fonseca Drug Trafficking Organization (Fonseca DTO) is a large-scale criminal enterprise involved in the importation, transportation, and distribution of controlled substances-specifically methamphetamine, heroin, and fentanyl.

5. My knowledge of the facts and circumstances alleged in this Affidavit come from my training and experience, my participation in this investigation, and my conversations with other law enforcement officers involved in this investigation. Because this Affidavit is submitted for the limited purpose of establishing probable cause to secure a complaint as described herein, it does not include every fact known to me concerning the investigation.

## PURPOSE OF AFFIDAVIT

6. I make this affidavit in support of an application for a criminal complaint and arrest warrants for **CESAR ALEJANDRO FONSECA-**

ECHAVARRIA ("CESAR"); JOSE ANDREAS FONSECA-ECHAVARRIA a/k/a "Jay," "Pony," "Andres" ("JOSE"); JUAN ANTONIO CERVANTES-ONTIVEROS a/k/a, "Juanito"; JEROME THOR CAMPBELL (a/k/a, "Thor", "Tulsa", "Old School"); OSVALDO CALVILLO-OROPEZA (a/k/a, Soldado); FELIX ANTONIO CAMPA-RIOS (a/k/a, "Toro"); CALISTA CHARMAINE CLARK, DANTE MAXEY and **JAVION JARREL WISBY,** for their participation in a drug conspiracy – that is a conspiracy to possess with intent to distribute and to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, 1,000 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, and 400 grams or more of a mixture or substance containing a detectable amount of N–phenyl–N–[1–(2–phenylethyl)–4–piperidinyl] propenamide (fentanyl), a Schedule II controlled substance, from in or about March 2020 and continuing thereafter until on or about April of 2021, in violation of 21 U.S.C. § 846.

## BACKGROUND TO THE INVESTIGATION

7.     The Fonseca DTO is operated by brothers CESAR FONSECA (**CESAR**) and JOSE FONSECA (**JOSE**) with the assistance of many others. The Fonseca brothers reside in the Oklahoma City area and operate their DTO throughout Oklahoma and Texas.

4

8.      Information developed during the course of this investigation has established that **CESAR** and **JOSE** rely on an extensive network of associates and customers in their drug distribution activities.  This network includes the following individuals and their roles in the organization:

a.  **CESAR ALEJANDRO FONSECA-ECHAVARRIA.  CESAR** is the leader and organizer of the local cell of this drug trafficking organization and is primarily responsible for the activities of the DTO, including coordinating the importation of bulk quantities of methamphetamine and other drugs into the Oklahoma City area, the collection of proceeds from the distribution of those drugs and the logistics of the day-to-day operation of his organization.  He regularly communicates directly with individuals in Mexico who control the source of supply of methamphetamine and other drugs.

b.  **JOSE  ANDRES  FONSECA-ECHAVARRIA.   JOSE** is the younger brother of **CESAR** and assists him in the day-to-day operation of the DTO, including locating customers for local distribution of methamphetamine and other drugs.

c.  **JUAN ANTONIO CERVANTES-ONTIVEROS.  CERVANTES** appears to be **CESAR's** primary associate.  **CERVANTES** resides at 2000 S. Independence, Oklahoma City, Oklahoma, a residence which has been used by the DTO to receive, store, and distribute

drugs, as well as to convert liquid methamphetamine into crystal form. **CERVANTES** also acts as a courier and right-hand man for **CESAR**, helping to coordinate drug deliveries in and around Oklahoma as well as trips to and from Texas where bulk methamphetamine and other drugs are obtained.

d. **JEROME THOR CAMPBELL. CAMPBELL** is significant customer of the DTO who receives frequent shipments of methamphetamine and heroin from the DTO, including deliveries personally made by **CESAR, CERVANTES** and **JOSE,** and couriers working for these individuals, including **CALVILLO. CAMPBELL** resides in the Tulsa area and was the original cooperating defendant who introduced the undercover officer to **JOSE** and the DTO.

e. **OSVALDO CALVILLO-OROPEZA. CALVILLO** is another courier and delivery driver who has been documented making deliveries of methamphetamine on behalf of the DTO.

f. **FELIX ANTONIO CAMPA-RIOS. RIOS** is an associate of the DTO who appears to be involved primarily in the fentanyl pill distribution side of the organization but has also made methamphetamine deliveries on behalf of **JOSE** and **CESAR**.

g. **DANTE MAXEY. MAXEY** is a customer of the DTO. On March 15, 2021, in conjunction with **CLARK**, **MAXEY** obtained approximately 1 kilogram of methamphetamine in a deal orchestrated by **CESAR**.

h. **CALISTA CHARMAINE CLARK. CLARK** is a customer of the DTO involved in the same March 15, 2021 transaction described herein.

i. **JAVION JARREL WISBY. WISBY** is a customer of the DTO dealing primarily in fentanyl pills in the Oklahoma City area.

9. The Fonseca DTO is responsible for the transportation and distribution of a significant amount of methamphetamine, heroin, and fentanyl in the Western District of Oklahoma and elsewhere. Hundreds of thousands of dollars are obtained in drug proceeds, much of which is used to pay the sources of supply in Mexico, either through wire transfers or bulk cash transactions. During this investigation, law enforcement has employed a number of investigative techniques, ranging from the use of cooperating defendants, undercover agents, controlled buys, consensually recorded phone calls, pole cameras and court-authorized Title III wiretaps. These techniques have shown the existence of an extensive conspiracy to distribute large amounts of methamphetamine, heroin, and fentanyl pills across Oklahoma.

7

## CONTROLLED PURCHASES

10. Law enforcement has had the benefit of one primary cooperating defendant (CD-1) and one undercover officer (UC-1) during this investigation. CD-1 was initially arrested on about February 13, 2020, in connection with a state charge relating to the trafficking of methamphetamine. CD-1 initially began cooperating with law enforcement and participated in setting up several transactions with his source of supply, someone he called "Jay" and later identified as **JOSE**. However, CD-1 continued to engage in undisclosed drug trafficking activity without the knowledge or approval of law enforcement. As detailed herein, CD-1, who is defendant **CAMPBELL**, was intercepted through wire interceptions and by surveillance purchasing significant quantities of methamphetamine and heroin from **JOSE** through at least March of 2021. **CAMPBELL** did not disclose these transactions to law enforcement, and they were not approved or requested by law enforcement in any way.

11. Through **CAMPBELL**, the undercover officer, physical surveillance and authorized wire interceptions, law enforcement has determined that the Fonseca DTO coordinates shipments of methamphetamine, heroin and fentanyl from California, Houston, Dallas, and other locations. Those controlled substances are then distributed to customers throughout Oklahoma by a network of individuals working for and with the Fonseca DTO.

8

12.     From March 2020 through January 2021, law enforcement engaged in a series of undercover transactions/purchases with **JOSE** and **CESAR** both through **CAMPBELL** and directly through UC-1.   Those interactions are summarized below:

a.     **March 19, 2020** – On or about March 19, 2020, **CAMPBELL** contacted **JOSE** to arrange for the purchase of methamphetamine. **CAMPBELL's** person and vehicle were searched prior to and after the transaction with negative results. **CAMPBELL** arranged to meet **JOSE** at a Taco Bell in Oklahoma City near **JOSE's** residence, which was then located at 3044 SW 65th Place, Oklahoma City, Oklahoma. **CAMPBELL** was provided with an audio transmitting device for use during the transaction. Agents could hear **CAMPBELL** place a phone call to the person he/she had identified as "Jay" confirming he/she was at the Taco Bell.   Shortly thereafter, agents observed a tan/gold colored Chevy pickup truck bearing Oklahoma tag number EEY-502 arrive at the Taco Bell.   Law enforcement had observed this vehicle leave **JOSE's** residence prior to its arrival. **CAMPBELL** exited his vehicle and got into the Chevy. Agents overheard **CAMPBELL** and **JOSE** discuss the transaction by way of the audio monitoring equipment.   **JOSE** told **CAMPBELL** that he actually had "twelve" (ounces of methamphetamine). **CAMPBELL** asked **JOSE** how much he

would owe (since the deal was originally set up to purchase eight ounces). **JOSE** told **CAMPBELL** that he would owe "600 for the extra four" and told **CAMPBELL** he could pay **JOSE** back later. Agents continued surveillance of the Chevy and followed it back to **JOSE's** residence. **CAMPBELL** then departed the area in his vehicle and met with law enforcement at a pre-determined location. During a subsequent debrief, **CAMPBELL** told officers that he took possession of the suspected methamphetamine, handed **JOSE** the $1,200 in buy money and exited the vehicle. **CAMPBELL** also reported that another Hispanic male, later identified as **RIOS**, was also in the Chevy during the transaction. The suspected methamphetamine weighed approximately 346 grams and was field tested positive for the presence of methamphetamine.

     b.   **March 25, 2020** – On or about March 25, 2020, agents directed **CAMPBELL** to arrange for the purchase of 1 pound of methamphetamine from **JOSE** in exchange for $2,500. **CAMPBELL** was again equipped with audio monitoring equipment and searched before and after the transaction with negative results. In anticipation of the deal, law enforcement officers were conducting surveillance at the Taco Bell and at **JOSE's** residence located at 3044 SW 65th Place, Oklahoma City, Oklahoma. Once **CAMPBELL** was parked at the Taco Bell, agents overheard **CAMPBELL** call **JOSE** and inform him he was

10

there. A short time later, officers observed a white Chevy Trailblazer with Oklahoma tag ISE-405[1] arrive at the Taco Bell. The driver of that Chevy Trailblazer, identified as **RIOS**, exited his vehicle, and got into **CAMPBELL's** vehicle. **RIOS** was in **CAMPBELL's** vehicle for a short period of time before exiting and driving away. Other agents observed the Chevy Trailblazer travel to **JOSE's** residence after it left the Taco Bell. **RIOS** was seen getting out of the Trailblazer, entering **JOSE's** residence and being inside for a short period of time before leaving again.[2] During a subsequent debrief, **CAMPBELL** informed agents that he exchanged the buy money for the suspected methamphetamine with the individual later identified as **RIOS**. Based on my training and experience, the short period of time that **RIOS** was in **JOSE's** house following the meeting with **CAMPBELL**, is consistent with **RIOS** delivering the buy money to **JOSE**. Officers took possession of the approximately 487 grams of a white crystalline substance that was later field tested positive for the presence of methamphetamine.

---

[1]     The Trailblazer is registered to a Maria Ontiveros, 2136 NW 11th Street, Oklahoma City, Oklahoma 73107. Maria Ontiveros also had utilities at 3025 Drexel Court, **CESAR's** prior residence.

[2]     **RIOS** was identified during a traffic stop which occurred shortly after he left **JOSE's** residence.

c.    **August 4, 2020** – On August 4, 2020, agents arranged a third controlled purchase between **CAMPBELL** and **JOSE**. Agents arranged for this transaction to occur at **JOSE's** residence at 3044 SW 65th Place, Oklahoma City, Oklahoma.    UC-1 accompanied **CAMPBELL.** At the direction of agents, **CAMPBELL** arranged to purchase 112 grams of methamphetamine for $2,100 from **JOSE**. During the controlled purchase, **JOSE** directed **CAMPBELL** to go to 3025 Drexel Court to complete the transaction by way of a text message. 3025 Drexel Court, Oklahoma City, Oklahoma, was later determined to be **CESAR's** residence. Upon arrival at the Drexel Court residence, agents observed a black Hummer parked outside, which **CAMPBELL** reported was **JOSE's** vehicle and which **JOSE** was subsequently seen driving. UC-1 parked in the street in front of the residence.  As **CAMPBELL** walked towards the residence, **JOSE** exited and met **CAMPBELL** in the front yard.  **JOSE** and **CAMPBELL** then both entered UC-1's vehicle. Once in the vehicle, **JOSE** retrieved a plastic bag that appeared to contain methamphetamine.  **CAMPBELL** handed **JOSE** the $2,100 in buy money. UC-1 then asked **JOSE** if they could meet directly in the future and **JOSE** agreed.  **JOSE** then exited the vehicle and UC-1 and **CAMPBELL** departed.  The white crystalline substance delivered by

12

**JOSE** field tested positive for the presence of methamphetamine and weighed approximately 113 grams.

  d. **August 12, 2020** - On August 12, 2020, agents arranged for a fourth controlled purchase with **JOSE**. On this occasion, **CAMPBELL** initially called **JOSE** at the direction of agents. **CAMPBELL** informed **JOSE** that he/she was not in town, but that UC-1 was there and was ready to purchase additional methamphetamine. **JOSE** indicated he was also out of town, but he could send someone he identified as his brother to deliver the methamphetamine. During this call, surveillance and undercover teams established themselves near **JOSE's** residence at 3044 SW 65th Place, Oklahoma City, Oklahoma, in anticipation of the deal happening there. **JOSE** asked **CAMPBELL** to forward UC-1's phone number so that **JOSE's** brother could get into contact with him/her. **CAMPBELL** agreed and forwarded UC-1's number to **JOSE**. A few minutes later, UC-1 received a phone call from (405) 875-2800. This caller, later identified as **CESAR**, directed UC-1 to meet him at the residence at 3025 Drexel Court, Oklahoma City, Oklahoma. **CESAR** further explained that he would need to go pick up the stuff from another location first. At this time, law enforcement conducting surveillance at 3025 Drexel Court observed a maroon Chevrolet Tahoe bearing OK tag number CEP-913 leave the residence. At approximately 1302 hours,

13

**CESAR** contacted UC-1 and confirmed that he had the methamphetamine and that he was driving a dark red Tahoe. UC-1 arrived at the residence on Drexel Court at approximately 1322 hours. When UC-1 did not see **CESAR's** vehicle, UC-1 called **CESAR** again and asked him where he was. **CESAR** said he was almost there. At approximately 1332 hours, **CESAR** called UC-1 to confirm that he had mistakenly gone to **JOSE's** house but was on his way back to Drexel Court. **CESAR** also asked if UC-1 could meet him at "the park." UC-1 confirmed that **CESAR** meant Reed Park, which was near the Drexel residence. As UC-1 drove toward Reed Park, he/she observed the same maroon Chevy Tahoe that had been previously observed. **CESAR** rolled down his window and gestured for UC-1 to follow him to an intersection where both vehicles parked. **CESAR** got into UC-1's vehicle and exchanged a Ziploc bag containing suspected methamphetamine for $3,000. The suspected methamphetamine was confirmed to contain methamphetamine by way of a field test and weighed approximately 163 grams.

e. **September 3, 2020.** On September 2, 2020, UC-1 received a phone call from **JOSE**. **JOSE** and UC-1 discussed prices for methamphetamine. **JOSE** indicated that he could sell kilograms of methamphetamine for $13,500. After some negotiation, **JOSE** agreed to

14

sell UC-1 a kilogram of methamphetamine for $12,500, $11,500 up front and $1,000 later. **JOSE** also asked UC-1 whether methamphetamine was the only kind of drug that he/she was capable of moving. UC-1 indicated that he/she could possibly move heroin, but that the market was not as large. **JOSE** responded that he would like to front UC-1 some heroin and that he also had some pills, he called "Oxy 30s", that he could also provide on front.[3] UC-1 and **JOSE** agreed to meet the following day. On September 3, 2020, UC-1 called **JOSE** and advised he/she was near SW 74th and May Avenue. **JOSE** gave UC-1 directions to his residence at 3044 SW 65th Place, Oklahoma City, Oklahoma. When UC-1 arrived, he/she saw **JOSE** standing in the front yard. **JOSE** invited UC-1 inside his house where they could complete the transaction. Once inside retrieved a Ziploc bag containing what appeared to be approximately 1 kilogram of methamphetamine. **JOSE** also handed UC-1 a plastic bag which appeared to contain approximately one quarter pound of suspected heroin. **JOSE** also provided a bag of pills that contained the "Oxy 30s". UC-1 then gave **JOSE** $12,500 in U.S. Currency for the methamphetamine, explaining that he/she wanted to pay for the entire

---

[3]     Based on prior investigations, investigators believe that these "Oxy 30s" were likely pills containing fentanyl which are pressed and marked to look like prescription Oxycodone.

amount at one time. UC-1 confirmed that he/she would still owe $4,800 for the heroin and $450 for the pills. UC-1 then left the residence. The suspected heroin and methamphetamine were field tested with positive results for the presence of heroin and methamphetamine respectively. The weights were confirmed to be approximately 1 kilogram of methamphetamine and 113 grams of heroin. These drugs have now been tested confirming the presence of heroin, fentanyl, and methamphetamine.

    f.    **September 23, 2020** - On September 22, 2020, UC-1 again contacted **JOSE** and arranged for another controlled purchase. UC-1 informed **JOSE** that he/she wanted to purchase one quarter pound of heroin. **JOSE** agreed to provide a quarter pound of heroin in exchange for $4,800 and agreed to meet the following day. On September 23, 2020, UC-1 travelled to **JOSE's** residence at 3044 SW 65th Place, Oklahoma City, Oklahoma. Once UC-1 was inside, **JOSE** showed UC-1 what appeared to be a half pound of heroin sitting on digital scales in his kitchen. **JOSE** told UC-1 that he wanted to front an additional one quarter pound of heroin that UC-1 could pay for later. **JOSE** also showed UC-1 what he claimed was methamphetamine in what appeared to be the form similar to an ice cube and gave UC-1 a small amount as a sample. **JOSE** handed UC-1 the half pound of heroin and a baggie

containing approximately 30 blue "Oxy 30" pills (again suspected fentanyl). UC-1 handed **JOSE** the $4,800. Agents later field tested the heroin and the sample of suspected methamphetamine, with each field-testing positive for the presence of heroin and methamphetamine respectively. Agents have since obtained lab results for the blue colored "Oxy 30" pills and have confirmed the presence of fentanyl.

       g.    **October 29, 2020** - On October 2, 2020, **JOSE** was arrested in Texas and subsequently removed to Mexico on October 30, 2020. On or about October 4, 2020, **CESAR** texted UC-1: "This is Jay's brother can you give me a call back." [4] UC-1 then called **CESAR** and the two discussed the money that was still owed by UC-1 to **JOSE** and the possibility of an additional "front" of drugs in the future.  On October 28, 2020, UC-1 texted **CESAR**: "Everything still good for me to come down tomorrow? Pay what I owe and get 4 more?" **CESAR** responded: "Yes all good." On October 29, 2020, **CESAR** directed UC-1 to meet with him at 3418 SW 29th St, Oklahoma City, Oklahoma, which is an address

---

[4]    While **JOSE** was in the local jail, he made several phone calls to **CESAR**. In those recorded calls, **JOSE** told **CESAR** information about customers and the people who still owed money to **JOSE** from prior deals. Based on my training and experience, I believe **JOSE** appeared to be passing on information to **CESAR** so that **CESAR** could continue to service **JOSE's** customers in anticipation of his pending deportation.

of a grocery store. **CESAR** also confirmed that he would be driving a maroon Chevy Tahoe, which was later confirmed to be the same Tahoe **CESAR** previously drove in connection with the August 12, 2020 transaction. Once he arrived, **CESAR** got out of his vehicle and into UC-1's vehicle. **CESAR** delivered 4 ounces of suspected heroin to UC-1. UC-1 gave **CESAR** $5,250 which was previously owed from the prior transaction with **JOSE**. The suspected heroin was later field tested positive for the presence of heroin with an approximate weight of 112 grams.

    h. **December 2, 2020** - On December 2, 2020, UC-1 called **JOSE**, who had returned to the United States, to discuss meeting to pay some of what was owed to **JOSE** and/or **CESAR**. The two agreed to meet at the McDonald's in Stroud, Oklahoma and **JOSE** indicated he would send someone to collect the money for him. When UC-1 arrived, he met with two Hispanic males driving a white Chevy Silverado bearing Oklahoma tag number AGR-086 (registered to Gilibaldo Calvilo-Ruiz at 3333 SW 17th in Oklahoma City). UC-1 gave the drug proceeds to one of the two Hispanic males. No drugs were exchanged on this date. UC-1 later confirmed that the person to whom he handed the money was **CALVILLO**.

i.    **December 17, 2020** - On December 16, 2020, UC-1 contacted **JOSE** to discuss payment for the remaining drugs. The two agreed to meet the following day, again in Stroud, Oklahoma.   On December 17, 2020, UC-1 and **JOSE** met at the McDonald's in Stroud, Oklahoma.   Surveillance observed **JOSE** at his house prior to the meeting, arranging items in the trunk of his car before immediately traveling from Oklahoma City to Stroud. Once both arrived in Stroud, UC-1 handed **JOSE** $1,200 and **JOSE** handed UC-1 a box which contained suspected methamphetamine.   The two then departed the area.   Following this exchange, the suspected methamphetamine was field tested positive for the presence of methamphetamine and weighed approximately 115 grams.

## OTHER DRUG TRANSACTIONS

13.    On January 21, 2021, the United States Postal Inspection Service (USPIS) intercepted a parcel mailed from an address in California to "3025 NW DREXEL COURT OKLAHOMA CITY, OK 73107", **CESAR's** residence.   A search warrant was obtained and a subsequent search of the package, revealed a vacuum sealed bundle containing blue pills labeled "M/30". The pills had a combined approximate weight of 507 grams (weighed in packaging) and have subsequently been tested positive for the presence of fentanyl.

## TITLE III INVESTIGATION

14.    During the course of the investigation, law enforcement also

obtained two judicially authorized wiretaps on: (1) (405) 482-7283 (TT1)[5], used

by **JOSE**; and (2) (405) 886-0462 (TT2), used by **CESAR**.[6] Interception of these

phones further revealed the extensive contours of this drug trafficking

operation.[7]

15.    For instance, on February 12, 2021, at approximately 1409 hours,

law enforcement intercepted a phone call from **JOSE**. **JOSE** called (405) 635-

7519, a phone number identified as being used by **CERVANTES** (TT1 Ref.

373).[8] During that call, **CERVANTES** said that he and **CESAR** are getting

---

[5]    On February 9, 2021, United States District Court Judge Patrick Wyrick
signed an order authorizing the interception of wire communications of cell
phone number (405) 482-7283 (TT1), for a period of 30 days.  Judge Wyrick
authorized the continuation of the wire interceptions for an additional 30 days
by order dated March 12, 2021. Interceptions ceased on April 1, 2021.

[6]    On March 12, 2021, United States District Court Judge Patrick Wyrick
signed an order authorizing the interception of wire and electronic
communications of cell phone number (405) 886-0462 (TT2). This cell phone was
identified by law enforcement as the phone number used by **CESAR**.
Communications were intercepted from March 12, 2021 through April 1, 2021.

[7]    The transactions described below do not constitute all of the transactions
observed by law enforcement over the course of the wire.  Rather, they are a
summary of the more significant transactions observed involving the primary
associates of the Fonseca DTO currently named in the complaint.

[8]    As articulated later in this affidavit, agents had obtained a GPS Ping on
this phone number.   A subsequent drug delivery was observed involving

ready to go "Cali" on Monday.  **CERVANTES** also said, "I will get the thirty

(30) again."  Law enforcement believes this was a reference to fake the

Oxycodone pills, often called "M-30s" and which often contain fentanyl.  Later

in the call, **JOSE** told **CERVANTES** that "if he [**CESAR**] tells the boss to

front him a dark girl, then he [**JOSE**] can pay him with cut ones."  "Dark girl"

is a code term often used for heroin and "cut ones" is likely a reference to

methamphetamine.  Based on the foregoing, law enforcement began to believe

that **CESAR** was higher up in the organization than **JOSE** and that both

**JOSE** and **CERVANTES** worked for **CESAR** in some capacity.

### February 13, 2021 Money Pickup in Kansas City

16.    On February 13, 2021, at approximately 1331 hours, law

enforcement intercepted a phone call to **JOSE**, from his brother, **CESAR**, who

at the time was using (405) 693-1527 (TT1 Ref. 392).  During the call, **CESAR**

tells **JOSE** there is a trip to Kansas to pick-up money.  **CESAR** directed **JOSE**

to go pick up the money and he will pay him $500 and $100 for gas.[9]  In a

---

**CAMPBELL** in Pryor, Oklahoma. A traffic stop following that delivery
revealed that **CERVANTES** was the individual who had completed that drug
delivery and GPS ping data confirmed that this phone number had travelled
from Oklahoma City to Pryor, consistent with the interceptions on the wire
and physical surveillance.

[9]    During the course of this same call, **CESAR** and **JOSE** also discuss the
fact that **CESAR** is planning to go to "Cali" but that he also has another trip
planned to "H" [believed to be a code term for Houston].  **JOSE** offers to go on

subsequent call **CESAR** called **JOSE** and asked, "Did you already drop off the girls? Are you leaving now?" (TT1 Ref. 392) JOSE responded, "No, I am going to bring them with me, so as to disguise things, dude."  Surveillance and intercepted phone calls would confirm that **JOSE** brought both his significant other, Kimberlee Carrasco, and their two young daughters on the trip to Kansas City. **CESAR** also asked **JOSE** if he went inside to count the money the last time he had made the trip and **JOSE** replied he did not. **CESAR** stated he thinks **JOSE** may have to go inside to count the money this time because there has been money missing lately.  **JOSE** asked if he was going to need to bring a gun or something and **CESAR** said no, just make sure he gets all the money.

17.    **JOSE's** money pick-up trip to Kansas unfolded over the next several hours.   At this time, law enforcement had a GPS tracking device installed on a Black Cadillac, bearing Oklahoma license tag IEP-375, which was known to be driven by **JOSE**. Data from this tracking device established that this Black Cadillac travelled from Oklahoma City to Kansas City, Kansas and back over the course of the evening of February 13, 2021.

---

the trip to Houston, but **CESAR** declines, saying he must be the one the make the trip.

18.   In addition, intercepted communications between **JOSE** and **CESAR** also confirmed the details of the pick-up.   At approximately 1708 hours, **JOSE** called **CESAR** and told him he passed Wichita, Kansas 30 minutes ago and had been driving for 3 hours (TT1 Ref. 421).   At approximately 1853 hours, **JOSE** called **CESAR** to tell him he was one hour away, and **CESAR** responded he would make the call to let them know (TT1 Ref. 431).   At approximately 1916 hours, **CESAR** called **JOSE** and told him that he sent him the address on WhatsApp (TT1 Ref. 447).   At approximately 2001 hours, **JOSE** told **CESAR** he was at the Rio Bravo Supermarket and **CESAR** responded he will call "them" (TT1 Ref. 451).   At approximately 2012 hours, **CESAR** told **JOSE** the person he is meeting is in green Malibu.   **JOSE** replied that the deal was already done, and he will be returning to Oklahoma (TT1 Ref. 452).

19.   On February 14, 2021, at approximately 0130 hours, **JOSE** told **CESAR** he was almost to Edmond (TT1 Ref. 488).   **JOSE** later confirmed that he was heading to **CESAR's** house (TT1 Ref. 494).   The tracker on **JOSE's** vehicle later confirmed that **JOSE** did travel to **CESAR's** residence at 3025 NW Drexel Court, Oklahoma City, Oklahoma, in the early morning hours of February 14, 2021. Based on the foregoing, I believe **JOSE** drove to **CESAR's** to give him the money he picked up, which were proceeds from the distribution of a drug of some kind and that these drug proceeds were being collected, in

23

part, in anticipation of **CESAR's** trip to Texas in which a bulk purchase of drugs was planned.

### February 13, 2021 Heroin Deal With CAMPBELL

20.    While **JOSE** was making the trip to Kansas City described above, he also arranged a drug delivery to **CAMPBELL**.   At approximately 1709 hours, **JOSE** called **CAMPBELL** (TT1 Ref. 422).   In that call, **CAMPBELL** said, "I got two for one, one day last time and that's what I'm about to do again." **CAMPBELL** then clarified, "The licorice, the licorice, the licorice, the licorice." Licorice is a code word often used for heroin. **JOSE** responded, "Yeah, two for one-thousand?"   **CAMPBELL** confirmed.   Based on my training and experience, I believe that $1,000 would be consistent with the price for two ounces of heroin and that the reference to "two for one" by **CAMPBELL** related to a prior deal in which **CAMPBELL** received 2 ounces of heroin for $1,000. Immediately after the call with **CAMPBELL**, **JOSE** called **CERVANTES** (TT1 Ref. 423). **JOSE** asked **CERVANTES**, "Does anyone want to go to..to..to Stroud?"[10]  **CERVANTES** asked, "What for?" **JOSE** responded, "To drop off two – two of the black girl." Again, the phrase "black girl" is consistent with a

---

[10]    **CAMPBELL** lives in the Tulsa area and is often referred to as "Tulsa". Based on my training and experience, Stroud is a common halfway point for meetings and drug transactions between people who live in Oklahoma City and Tulsa.

reference to heroin. This second conversation between **CERVANTES** and **JOSE** confirms that **CAMPBELL** had ordered two ounces of heroin from **JOSE**.

21.    Over the course of the rest of the evening, there are multiple calls relating to this transaction. For instance, **CERVANTES** calls **JOSE** to inform him that "Lobo"[11] would make the delivery (TT1 Ref. 424). At approximately 2024 hours, "Lobo", using (405) 679-5890, called **JOSE**. During this call Lobo agreed to make the trip to Stroud for $350. **JOSE** remains in contact with both **CAMPBELL** and Lobo over the course of the evening trying to arrange the details of the meeting place. There are multiple calls in which **JOSE** talked to Lobo and **CAMPBELL** trying to coordinate the details of who Lobo is meeting (a courier for **CAMPBELL**) and where exactly they are meeting. This course of communication leads up to a final call at approximately 2219 hours in which **JOSE** told Lobo to keep the money for him and Lobo confirmed (TT1 Ref. 487). Through my training and experience, I believe that this final call confirmed that Lobo had delivered the drugs, collected the $1,000 and was going to hold it for **JOSE** to pick up at a later time.[12]

---

[11]    "Lobo" or "Lobito" is a delivery driver and courier working for the DTO. Law enforcement is continuing to investigate to confirm his precise identity.

[12]    In the early morning hours of February 14, 2021, **JOSE** called Lobo several times and **JOSE** arranged to travel to Lobo house (TT1 Ref. 496, 497,

**CESAR's Drug Run to Dallas On February 17, 2021**

22.     On February 17, 2021, law enforcement was able to confirm that **CESAR** had travelled to Dallas and Houston, consistent with **CESAR's** earlier discussion with **JOSE**.  For instance, law enforcement had obtained a GPS ping warrant on **CESAR's** previous (405) 693-1527 cell phone.  Data from those pings during the times of these intercepted calls, registered locations ranging from Oklahoma City, the Houston, Texas area, the Dallas Ft. Worth, Texas area and ultimately back to Oklahoma City.

23.     At approximately 1602 hours, **JOSE** called **CESAR** at (405) 693-1527 (TT1 Ref. 581).   In that call, **CESAR** confirmed that he was in Dallas. **JOSE** asked, "When are you coming back?" and **CESAR** responded he would be back later that night.  **JOSE** then asked, "listen do you have uh, uh..work over here in the city?"  Based on my training and experience, I know that "work" is a common code term for drugs.  When **CESAR** said, "No, dude. Why?", **JOSE** responded, "Uh… Tulsa [**CAMPBELL**] needs uh…a uh..a bird." Based on my training and experience, I know that a "bird" is a common code term used for a kilogram of a drug.   **CESAR** responded that **JOSE** should, "let him [**CAMPBELL**] know it'll be tonight. That I will see him at my place."

_____

498).  Based on these calls, I believe that **JOSE** was travelling to Lobo's house to pick up the proceeds from the sale.

As outlined above, **CESAR** had previously discussed trips to Dallas and Houston which law enforcement believed involved picking up a bulk load of drugs, most likely methamphetamine. The purpose of **JOSE** picking up money in Kansas City, just prior to **CESAR's** trip, was believed to be consistent with gathering money to pay for such a bulk purchase of drugs. The fact that **CESAR** told **JOSE** that he did not have any "work" in the city, but that **CAMPBELL** could meet him later that night, when **CESAR** was returning to Oklahoma City, provided confirmation that **CESAR** was likely returning with methamphetamine from his trip to Houston and Dallas. **CESAR** also asked **JOSE**, "How much did you tell him?" **JOSE** responded, "The last time we talked, was at eight." Based on my training and experience, I believe that what is being discussed is a deal for one kilogram of methamphetamine for $8,000, which was consistent with the going rate for methamphetamine as of February 2021.

### CESAR's February 18, 2021 Delivery Of 1/2 Kilogram of Methamphetamine To CAMPBELL

24.     It does not appear that the transaction contemplated above with **CAMPBELL** was completed on February 17, 2021. Rather, it appears that the deal was completed the following day. At approximately 1055 hours, **JOSE**

called **CESAR** to let him know that "Tulsa" only needs a half (TT1 Ref. 637)[13].
**CESAR** indicates that if "Tulsa" is only getting half, he needs to come to
**CESAR** and/or pay the cost of a courier. **JOSE** inquired whether **CESAR**
would be willing to consider meeting in Stroud and **CESAR** appears to have
agreed. Based on the foregoing conversations, it appears that **CESAR** would
be personally delivering a half kilogram of methamphetamine to **CAMPBELL**.
A few hours later at approximately 1514 hours, **JOSE** called **CESAR** again
(TT1 Ref. 677). **CESAR** confirmed he was leaving and asked **JOSE** how long
it would take to get there. **JOSE** responded that it should take an hour and
that **CAMPBELL** is a little more than an hour away.   These times and
distances are consistent with **CESAR's** travel from Oklahoma City to Stroud
and **CAMPBELL's** travel from his home in Pryor, Oklahoma, to Stroud.
**JOSE** then called **CAMPBELL** to tell him to leave right away (TT1 Ref. 679).
Subsequently, **CESAR** called **JOSE** to tell him that **CESAR** had arrived and
asked about **CAMPBELL's** whereabouts (TT1 Ref. 690).  **JOSE** responded
that **CAMPBELL** was running about 10 minutes late. **CESAR** told **JOSE** to
let **CAMPBELL** know to meet him at the store over where the Sonic is. **JOSE**

---

[13]    Law enforcement was only authorized to intercept voice calls over TT1.
Toll data and other information indicated that **JOSE** and **CAMPBELL** did
exchange multiple text messages between one another prior to this call, but
the content of those messages was not intercepted.

immediately called **CAMPBELL** and told him to meet **CESAR** at the Sonic and that **CESAR** would be driving a white Explorer (TT1 Ref. 691).

25.    In anticipation of this deal, law enforcement had established surveillance in and around the Stroud area in the hopes of observing the transaction. At approximately 1645 hours, surveillance units initially set up in the area of the McDonalds restaurant in Stroud, Oklahoma.    At approximately 1713 hours, surveillance units observed a silver/gray Chevy Trailblazer, believed to be bearing Oklahoma tag CJS-853 arrive at the McDonalds. UC-1 had previously identified a vehicle of this exact description as being associated with **CAMPBELL** from information received from investigators for the Mays County Sheriff's Department familiar with **CAMPBELL**. The Trailblazer circled the McDonalds parking lot and departed, driving across the street to the On-Cue gas station/convenience store. Investigators believe the driver of the Trailblazer was **CAMPBELL**. At approximately 1717 hours, surveillance units observed **CESAR's** previously identified white Ford Explorer, bearing Oklahoma tag KXJ-323, arrive at the Sonic restaurant in Stroud. At approximately 1718 hours, surveillance units observed the Trailblazer drive a short distance to the Sonic restaurant and park next to **CESAR's** Explorer.    At approximately 1720 hours, law enforcement observed an unidentified Hispanic male (UHM) passenger wearing dark pants and plaid shirt or jacket, believed to be **CESAR**, exit

29

CESAR's Explorer carrying a bag. The UHM placed the bag in the back seat of the Trailblazer and then retrieved a bag from the Trailblazer and carried it back to the Explorer, consistent with the delivery of the half-kilogram of methamphetamine discussed above. At approximately 1722 hours, the reporting agent observed CESAR's Explorer depart the Sonic. Electronic surveillance confirmed that the vehicle then drove back to CESAR's house on Drexel Court in Oklahoma City.

### February 24, 2021 Delivery of Methamphetamine to CAMPBELL

26.     On February 24, 2021, at approximately 1323 hours, JOSE called CAMPBELL (TT1 Ref. 871). In that call, CAMPBELL asked whether the price was "forty or fifty-one." JOSE responded he would check and "try to get them all the way over there." CAMPBELL responded that he would give him "fifty-three" and that was basically about "three or so". Based on my training and experience, I believe that JOSE and CAMPBELL are discussing a delivery of a half-kilogram of methamphetamine to CAMPBELL in the Tulsa area. The discussion of "40" or "51" is language commonly used to refer to $4,000 or $5,100, which was the approximate going price for a half-kilogram of methamphetamine at the time. CAMPBELL's reference to "three or so" if JOSE could get them "all the way there," reflects CAMPBELL's offer to pay an extra $300 as a delivery fee if JOSE could arrange for a delivery all the way to the Tulsa area.

27.    On February 24, 2021, at approximately 1325 hours, immediately after the call to **CAMPBELL**, **JOSE** called **CESAR** (TT1 Ref. 872).   In that call, **CESAR** asks **JOSE** about the "other one" and **JOSE** responds that it "has to be ready by now." When **CESAR** asks "where", **JOSE** responds "T's house." **CESAR** and **JOSE** commonly refer to **CAMPBELL** as "T." **CESAR** then complains that, "That's bullshit that we're bringing it to him." **JOSE** responds that **CAMPBELL** was offering to pay $200 for the delivery fee. While **CESAR** appeared to be unhappy with the idea of making a delivery all the way to Tulsa for **CAMPBELL**, investigators believed that there would be a delivery to **CAMPBELL** sometime that day.

28.    By this date, law enforcement had set up a pole camera at 2000 S. Independence, Oklahoma City, Oklahoma, a residence known to be used by **CERVANTES**. At approximately 1418 hours, the pole camera recorded **CERVANTES** and a female later identified as Rosa VALDEZ exiting the residence with **CERVANTES** carrying a black toolbox. **CERVANTES** placed the toolbox in the rear passenger side of a maroon Chevy Tahoe bearing OK-Tag KXJ-027. **CERVANTES** got into the front driver's side of the Tahoe and VALDEZ into the front passenger's side. The Tahoe then departed.

29.    Later, on February 24, 2021, at approximately 1529 hours, **JOSE** called **CAMPBELL** again (TT1 Ref. 881). **CAMPBELL** says he just got a phone call and a text message "saying they was on the way." At this time, law

31

enforcement had obtained a GPS ping on phone number (405) 635-7519, a phone number believed to be used by **CERVANTES**. At approximately 1630 hours, electronic surveillance of that phone showed **CERVANTES** to be in Tulsa, Oklahoma, having travelled from Oklahoma City.

30.   At approximately 1654 hours, electronic surveillance showed **CERVANTES** to be in Pryor, Oklahoma, near **CAMPBELL's** residence. Local law enforcement officers established surveillance at **CAMPBELL's** residence in the hopes of observing the transaction between **CAMPBELL** and **CERVANTES**. Law enforcement conducting surveillance at **CAMPBELL's** residence observed **CERVANTES's** Chevy Tahoe arrive at **CAMPBELL's** residence.   The vehicle was there for a short period of time, approximately 8 minutes, before departing.   In my training and experience, the short duration of time that **CERVANTES** was in the residence was consistent with a drug delivery. After the Tahoe left **CAMPBELL's** residence, officers initiated a traffic stop due to an observed traffic violation.   During the traffic stop, the officer confirmed that the vehicle was occupied by **CERVANTES** (front seat passenger), who identified himself by name, and Rosa VALDEZ (driver) who identified herself by way of her Oklahoma Driver's license. The occupants of the vehicle were given a verbal warning for the traffic violation and released. Electronic surveillance on **CERVANTES's** phone showed that he travelled back to Oklahoma City after leaving **CAMPBELL's** residence.   Based on the

32

foregoing sequence of events and on my training and experience, I believe that **CERVANTES** delivered a half-kilogram of methamphetamine to **CAMPBELL** as organized by both **JOSE** and **CESAR**.

### February 28, 2021 Money Delivery by JOSE to Dallas

31. On February 25, 2021, **CESAR** called **JOSE** to discuss an upcoming trip to Dallas (TT1 Ref. 906). In that call, **CESAR** told **JOSE** that he would "let you know when – so you can go to D" and "I think it will arrive tomorrow." **CESAR** then impresses upon **JOSE** that he intends to start using **JOSE** in a higher-level role in the organization, telling him, "This is going to get a little more serious, Andres", "I need you to get a house because I may put you in charge of making some deliveries here" and "the boss told me he does not want people who are making a mess every day." Based on the foregoing, I believe that **CESAR** was planning to send **JOSE** to Dallas to pick up drugs, likely methamphetamine. However, on February 27, 2021, **JOSE** called **CESAR** (TT1 Ref. 959). In that call, **CESAR** says that "tomorrow got cancelled" because "the ones who were transporting it to D, dude, and the fucking car got a flat tire and it was inside the tire. So, it went to hell." **CESAR** later asked **JOSE** "you wanna go tomorrow and then just take some money to the H? I mean, to Dallas." **JOSE** responds that he would go.

32. On February 28, 2021, monitoring of TT1 resulted in the interception of a series of phone calls involving **JOSE**, **CESAR,** and an

33

unidentified female (UF7484).   At approximately 1143 hours, **CESAR** called **JOSE** (TT1 Ref. 979). **CESAR** asks **JOSE** for an address in Dallas where he wants to meet.   **JOSE** responds "well, if you want, uh, over there at the same restaurant" which they identify as "San Pelotas" or "San Pancho." At this time, law enforcement had a GPS ping on **JOSE's** phone, TT1.   Using that information and physical surveillance, law enforcement observed **JOSE** travel to the parking lot of a restaurant named Pancho's Restaurant, in Dallas, Texas. Prior to his arrival, there were several intercepted calls between **JOSE** and UF7484.  In the first, at approximately 1258 hours, UF7484 called to say she was calling to "pick up the ticket" (TT1 Ref. 981). I know from my training and experience that "ticket" is a code term used for money.   **JOSE** responds that he is approximately 45 minutes away.   UF4784 responds that she is already there, "at the address they sent me."

33.    At 1315 hours, **CESAR** called **JOSE** (TT1 Ref. 982).   **CESAR** asked if it was done yet and **JOSE** says no but asked "how much am I going to give to this first one?" **CESAR** responded, "twenty-two seven hundred." In my training and experience, it is common for individuals trafficking drugs to drop a zero from a number when discussing money.  Accordingly, I believe **CESAR** is referring to $22,700 dollars, which is believed to proceeds from prior drug sales. At approximately 1340 hours, **JOSE** called UF7484 and told her that he was in a "black Mercedes" and that he was "[h]ere in front of the place,

34

Pancho's Restaurant" (TT1 Ref. 983). Law enforcement had previously seen **JOSE** driving a black Mercedes in and around Oklahoma City. At 1342 hours, **JOSE** called **CESAR** to confirm that the "twenty-two seven hundred is the Alka-Seltzer one, right?" (TT1 Ref. 984). **CESAR** confirmed. An HSI Dallas agent conducting surveillance at that time observed a black Mercedes at the Pancho's Restaurant at this time

34. At approximately 1343 hours, HSI Dallas surveillance units observed a 2021 white Ford Expedition bearing paper tag TX 03205J7 arrive at Pancho's and park next to the black Mercedes. Surveillance units observed **JOSE** exit the Mercedes and take a package to the driver side window of the Expedition and pass the package to a Hispanic female. At approximately 1345 hours, HSI Dallas surveillance units observed the Expedition depart.

35. At 1343 hours, **JOSE** called **CESAR** to confirm that he had given the first package ($22,700 to UF7484) and to ask, "what's up with the rest?" (TT1 Ref. 986). **CESAR** replied that he would call right back. Law enforcement maintained surveillance on **JOSE** as he began to travel towards Garland, Texas, ultimately following him to a restaurant named "Miguelito's". At approximately 1501 hours, **JOSE** called **CESAR** and told him that he was "here at Miguelitos" (TT1 Ref. 991). Agents maintained surveillance of **JOSE** and observed him take a blue package and give it to the driver of a blue 2002 Ford F-150 pickup bearing Texas tag HDG7283.

36.    Shortly after law enforcement observed the exchange, **JOSE** called **CESAR** to confirm that it was "done" and that, "I asked her how much it was and she said thirty" (TT1 Ref. 992). Based on my training and experience, I believe that **JOSE** delivered to the driver of the F-150, $30,000 which also represented payment for drugs previously distributed. Surveillance of **JOSE** continued, as the black Mercedes travelled back to Oklahoma. Surveillance units observed **JOSE** drive directly to **CESAR's** then residence at 3025 NW Drexel Court, Oklahoma City, Oklahoma, before surveillance was terminated.

### March 1, 2021 Methamphetamine and Heroin Delivery To CAMPBELL

37.    On March 1, 2021, **CAMPBELL** called **JOSE** to discuss the potential purchase of another ½ kilogram of methamphetamine (TT1 Ref. 1016). **CAMPBELL** said that he had money in his pocket, but that he could not do a deal that night because he would be at the Hard Rock all night. **JOSE** responded that he could "send somebody to the Hard Rock if you want." **CAMPBELL** confirmed that would work and that he wanted the "same that we've been doing the last two times" and confirmed that he would give "forty-two." Based on my training and experience, I believe that the reference to "forty-two" is $4,200 which is the approximate price for a half-kilogram of methamphetamine at the time and is consistent with prior deals involving **CAMPBELL** and **JOSE**. Later in the call, **JOSE** asks **CAMPBELL** how he

36

is doing with the "liquorish," a code term used for heroin. **CAMPBELL** and **JOSE** discuss a problem with a prior deal and **JOSE** finally confirms that if **CAMPBELL** wants another 2 it will be "52" (i.e., $5,200). Based on the foregoing, I anticipated there would be a delivery of both methamphetamine and heroin to **CAMPBELL** in Tulsa by the DTO.

38. Approximately 17 minutes later, **JOSE** called **CESAR**, who by this point was using (405) 886-0462 (TT2) (TT1 Ref. 1020). In that call **CESAR** confirmed that he changed his number and the two discussed the deal with **CAMPBELL**. **JOSE** confirmed that "Tulsa" is wanting the same thing. **CESAR** confirms, "just half." **JOSE** confirmed and explained that **CAMPBELL** wanted it that night at the Hard Rock and would pay "forty-two." **CESAR** responded, "Only two hundred. That's bullshit, Andres." Based on my training and experience, I believe that this confirms the details of the deal **JOSE** was negotiating with **CAMPBELL**, specifically that **CAMPBELL** wanted a half kilogram of methamphetamine $4,000 and that **CAMPBELL** is only offering to pay $200 to have it delivered to Tulsa. **JOSE** responded that it was all right because **CAMPBLL** wanted "licorice, he also wants the black girl" and that he could probably get another two hundred from "Tony".[14]  In

---

[14]   Through the course of this investigation, law enforcement has established that the DTO traffics in methamphetamine, heroin, and fentanyl pills. **CESAR** appears to directly handle the methamphetamine side of the

my training and experience, the terms "licorice" and "black girl" are code terms used to refer to heroin.

39.     Later on March 1, 2021, **CESAR** called **JOSE** to find out what he was doing (TT1, Ref. 1023). **JOSE** responded that he was still waiting for "Tony". **CESAR** confirmed that **JOSE** was going to give him "four even" ($4,000 for the half-kilogram of methamphetamine) and that **JOSE** would be "making your money from the two he's going to give you and whatever you take from the other one."     Based on the foregoing, I believe that **JOSE** would be personally delivering a half kilogram of methamphetamine and two ounces of heroin to **CAMPBELL** in Tulsa.     Based on my training and experience, I believe that **CAMPBELL** was getting the half kilogram of methamphetamine for $4,000, 2 ounces of heroin for $1,000 and paying a $200 delivery fee. **JOSE** was going to make money from the $200 delivery fee **CAMPBELL** was willing to pay and whatever money "Tony" would give **JOSE** to deliver the heroin. Later, **JOSE** confirmed to **CESAR** that he was on his way (TT1 Ref. 1044). At approximately 2114 hours, **JOSE** called **CAMPBELL** to tell him that he had arrived (TT1 Ref. 1051).  In that call, **CAMPBELL** and **JOSE** discuss where

---

operation. Fentanyl pills are believed to be delivered to the DTO primarily by mail from California and then distributed by the DTO.  Heroin is believed to be primarily sourced from another individual operating in Oklahoma City and that "Tony" is the individual who supplies heroin to the Fonseca brothers.

each of them is and try to identify where **CAMPBELL** is standing outside of the casino. They ultimately confirm that they can see each other. Based on my training and experience and the phone calls discussed above, I believe that **JOSE** delivered a half-kilogram of methamphetamine and 2 ounces of heroin to **CAMPBELL**.

### March 12, 2021 Delivery Of Heroin And Methamphetamine To CAMPBELL

40.    On March 12, 2021, at approximately 1241 hours, **JOSE** called **CAMPBELL**. In that call, **CAMPBELL** told **JOSE** that he has some people that "want licorice" and that he could take "three, maybe four" (TT1 Ref. 1622). Based on my training and experience, "licorice" is a code word often used to refer to heroin and the reference to "three, maybe four" is a reference to 3-4 ounces of heroin. **JOSE** also asked about "the other." Given **CAMPBELL's** history of purchasing methamphetamine through **JOSE**, "the other" is believed to be a reference to methamphetamine. **JOSE** tells **CAMPBELL**, "I'll do the four thousand (4,000) for the half and I'll let you borrow the other half. How about that?" **CAMPBELL** responded, "You're talking about the keys, right?" **JOSE** affirmed and also said he would get him a number on the "other" (i.e., the heroin).

41.    A short time later, at approximately 1405 hours, **JOSE** called **CAMPBELL** again and told him it would be three thousand (3,000) for five (5)

(TT1 Ref. 1637). Based on my training and experience, I believe that this reference is to the sale of 5 ounces of heroin for $3,000, which would be consistent with the price for that amount. **CAMPBELL** responded that he needs to check with someone because if he does that price for the heroin, he will not have enough to do anything else. At approximately 1538 hours, **CESAR** called **JOSE** (TT1 Ref. 1651). In that call, **CESAR** asked if **JOSE** had spoken to "Tulsa" (**CAMPBELL**). **JOSE** responded that he is going to get "half" and that he would be paying $4,000. **JOSE** and **CESAR** then discuss that the deal is going to happen in Stroud and **JOSE** was going to see how much **CAMPBELL** would pay the driver.

42.    At approximately 1602 hours, **CAMPBELL** called **JOSE** again (TT1 Ref. 1659). **JOSE** asked if **CAMPBELL** wanted to get the "half-bird" and **JOSE** would give him the whole one. **CAMPBELL** confirmed that he would have $7,000 and would owe 4 ($4,000) if **JOSE** could bring it to the Hard Rock (Hard Rock Casino near Tulsa). Based on the foregoing conversations, I believe that **JOSE** would be delivering the 5 ounces of heroin for $3,000 and 1 kilogram of methamphetamine for $8,000, $4,000 of which would be paid up front and $4,000 of which would be owed later.

43.    Following this call, **JOSE** called **CESAR** at 1623 hours (TT1 Ref. 1662). **JOSE** told **CESAR** that **CAMPBELL** is ready, that "you are going to give him a – a whole one, so he'll owe you four" and that **JOSE** had agreed to

go all the way to the Hard Rock.  **CESAR** complains that it should be a $600

fee to take it all the way to the Hard Rock, but that he would talk to "Juanito"

"so he can go with his guy." "Juanito" is a nickname for Juan and is believed to

be a reference to **CERVANTES**.

44.    At approximately 1655 hours, **CERVANTES** called **JOSE** (TT1

Ref. 1668).  He told **JOSE** that his "soldado" (soldier) is about to leave.  **JOSE**

says not to let them leave yet because he is "going to get the gift".  Based on

my training and experience and the foregoing intercepted calls, I believe that

**CERVANTES** handles much of the methamphetamine for the DTO, but that

heroin is sourced from a different person.  I believe **JOSE's** statement that he

is going to get the "gift" is a reference to him picking up heroin from that source

so that the courier (i.e., "soldado") can bring both the methamphetamine and

the heroin to **CAMPBELL** in Tulsa.     Later, **CERVANTES** and **JOSE**

exchange phone calls wherein **JOSE** asks **CERVANTES** to send "him" to

**JOSE's** mother-in-law's house on SW 31st Street in Oklahoma City (TT1 Ref.

1675, 1676).

45.    At approximately 1741 hours, electronic surveillance showed a

gray Chevy Silverado extended cab pickup, bearing Oklahoma tag LWY-693,

arrive at 2000 S. Independence in Oklahoma City (the residence of

**CERVANTES** and suspected methamphetamine stash house).  Registration

information on the Silverado returns to Gilibaldo Calvillo, 5500 S. Land,

Oklahoma City, Oklahoma.   At approximately 1747 hours, electronic surveillance showed the Silverado depart the Independence residence with two Hispanic males in the vehicle. At 1755 hours, **CERVANTES** called **JOSE** to confirm that his "soldado" was outside of **JOSE's** mother-in-law's house (TT1 Ref. 1679).   Electronic surveillance showed what appeared to be the same Silverado that had just left **CERVANTES's** house arriving at 2300 SW 31st Street, Oklahoma City, Oklahoma, where **JOSE** was then residing.  I believe that the foregoing sequence of events confirms that **CERVANTES's** courier in this instance went to **CERVANTES'** house first to pick up the 1 kilogram of methamphetamine before going to **JOSE's** house to pick up the heroin that would complete **CAMPBELL's** order.

46.    At 1803 hours, **JOSE** called **CAMPBELL** to let him know that the "thing" is on the way (TT1 Ref. 1682), consistent with the delivery drivers in the Silverado leaving just a few minutes earlier.  **CAMPBELL** confirmed and asked to confirm that the courier was going to the Hard Rock.   **JOSE** confirmed. At 1819 hours, **JOSE** called **CERVANTES** again (TT1 Ref. 1692). **CERVANTES** asked whether his people would be meeting right at the Hard Rock or somewhere nearby.  **JOSE** confirmed it was right at the Hard Rock. In  a  later  conversation,  **CERVANTES**  and  **JOSE**  confirm  that **CERVANTES's** guy should be picking up $7,200 and that **CERVANTES's**

guy would count it when it arrived to make sure it was all there (TT1 Ref. 1696).

47. At approximately 1953 hours, **CERVANTES** called **JOSE** to tell him to inform **CAMPBELL** that the drivers will be at the Hard Rock in 15 minutes and asking what vehicle **CAMPBELL** will be driving (TT1 Ref 1698). **JOSE** says **CAMPBELL** might be driving a Blazer, but he will make sure. Law enforcement has observed **CAMPBELL** drive a Chevrolet Trailblazer on numerous occasions. At 2005 hours, **JOSE** called **CAMPBELL** and told him that he should go to the same spot where **JOSE** had previously met with him (TT1 Ref. 1704). **JOSE** also tells **CAMPBELL** that the guys would be driving a Silverado.

48. At approximately 2008 hours, **JOSE** and **CERVANTES** talk about where "soldado" needs to go and **CERVANTES** asks if it is all right if he gives his "soldado" **CAMPBELL's** number in case they need to find each other (TT1 Ref. 1706). At this time, there are also several text messages that appear between **CAMPBELL** and **JOSE**. Because interception of text messages was not authorized, the content is not available, but it appears that **JOSE** was coordinating additional details with **CAMPBELL** by text message.

49. At approximately 2015 hours, **JOSE** called **CERVANTES** again (TT1 Ref. 1709). During this call **CERVANTES** tells **JOSE** that the "soldier is there". Agents conducting surveillance in the casino parking lot observed

what appeared to be the previously observed Silverado and were later able to confirm that it was in fact the same Silverado seen earlier at 2000 S. Independence.  Agents observed the Silverado park next to a tan Chevy Trailblazer. Agents next observed a white male matching the known physical description of **CAMPBELL** exit the Trailblazer and enter the passenger side of the Silverado. The Silverado then drove around the parking lot briefly before returning to the Trailblazer. The same white male believed to be **CAMPBELL** then exited the Silverado and the Silverado left the parking lot. Based on my training and experience, I believe that **CAMPBELL** obtained the previously discussed methamphetamine and heroin and paid the $7,200 price to the occupants of the Silverado during their brief drive around the parking lot.

50.     Shortly thereafter, at approximately 2020 hours, **CERVANTES** called **JOSE** and told him "it's done", that "soldado" was on the way back and that **CERVANTES** will count it [the money] when he gets it (TT1 Ref. 1714).

51.     At approximately 2030 hours, agents requested assistance from the Oklahoma Highway Patrol in locating and potentially identifying the occupants of the Silverado seen meeting with **CAMPBELL**.  OHP troopers were able to stop the Silverado near the Hard Rock casino on Interstate 44. Upon pulling the vehicle over on a traffic violation (changing lanes unsafely), an Oklahoma Highway Patrol Trooper identified the two occupants as **OSVALDO CALVILLO** (driver), by US Immigration Employment ID and

44

Jorge Puentes, by an Oklahoma state driver's license. **CALVILLO** provided the Trooper "5500 S. Land Oklahoma City, Oklahoma" as his home address. The Trooper issued **CALVILLO** a warning and released both individuals and the vehicle from the scene.

52.     At approximately 2225 hours, **CERVANTES** called **JOSE** and told him that his guy was 30 minutes away (TT1 Ref. 1742). **JOSE** old **CERVANTES** to let him know when they arrive so he can come over to **CERVANTES's** house. At approximately 2248 hours, **JOSE** called **CERVANTES**, and both confirmed they were on their way to **CERVANTES's** house (TT1 Ref. 1760).  At approximately, 2252 hours electronic surveillance recorded **JOSE's** black Hummer arrive at 2000 S. Independence and park in the street. Shortly thereafter, at approximately 2254 hours, **CERVANTES's** Chevy Tahoe arrived and parked in the driveway. It appears that the occupants of both vehicles, believed to be **CERVANTES** and **JOSE** entered the residence. At approximately 2321 hours, a male believed to be **JOSE** exited the house and departed in the black Hummer.  Based on surveillance I believe that **JOSE** met **CERVANTES** (and **CERVANTES'** couriers) at his house to pick up the money that **CAMPBELL** had paid for the heroin and methamphetamine previously delivered that evening.

**March 13, 2021 CESAR Travels to Dallas To Pick Up Methamphetamine and Drop Off Money**

53.     On March 12, 2021 at 2238 hours, **JOSE** and **CESAR** had a conversation in which **CESAR** indicated that he had to go to "D" (Dallas) tomorrow to deliver some money (TT1 Ref. 1757).  Consistent with that call, GPS ping data from **CESAR's** and **CERVANTES's** phones along with GPS tracker data for the white Ford Explorer showed both **CESAR** and **CERVANTES** arriving in the Dallas area at just after midnight on March 13, 2021, staying at a Marriott hotel.

54.     The next morning, still on March 13, 2021, at approximately 0953 hours, **CESAR** received a call from a male using a Mexican phone number 52-435-103-0438 (UM0438) (TT2 Ref. 37).  Starting with this call and through a series of calls that followed, UM0438 directed **CESAR** through a series of transaction in which **CESAR** delivered a large sum of money to certain individuals in Dallas and then picked up a large amount of methamphetamine to bring back with him to Oklahoma City.   Based on this call and subsequent interceptions, UM0438 appears to be the individual in control of the source of supply of methamphetamine and **CESAR's** ultimate boss.

55.     At approximately 0953 hours, UM0438 tells **CESAR** "the guy who's bringing the money will be arriving at one (1:00 p.m.)" (TT2 Ref. 037).  UM0438 tells **CESAR** to deliver the "thirty-two" (32) to an unidentified person.

UM0438 adds that **CESAR** will be given some "pieces" by another unidentified person, concluding "once you deliver the thirty-five thousand that...that you are going to get from what they are bringing....then you go pick up the pieces that you will be taking up with you." Based on my training and experience, "pieces" is code for methamphetamine and the conversation indicated that **CESAR** would be picking up a large sum of methamphetamine and delivering approximate $35,000 in U.S. Currency to one or more individuals in Dallas. The precise details emerged in later calls.

56. In a later call, at approximately 0959 hours, UM0438 reaffirms to **CESAR** that, "You will be giving them thirty-two (32) and they are going to give you nineteen pieces." (TT2 Ref. 038) He also instructs **CESAR** that once he receives the 19, he will separate it into fifteen (15) and four (4). UM0438 adds that **CESAR** will also be given a package with money from another unidentified person. **CESAR** will then give that person 15 pieces. Based on my training and experience, I believe that **CESAR** was going to be delivering $32,000 to one individual and picking up 19 kilograms of methamphetamine. Another person would be bringing **CESAR** some additional money and that he would give that person 15 of the 19 kilograms, keeping the remaining 4 kilograms of methamphetamine for himself.

57. At approximately 1057 hours, **CESAR** received a text message from (214) 412-4990 (UM4990), a Dallas based area code, that read: "2332 W

Northwest Hwy, Dallas, TX 75220" (TT2 Ref. 41) and a second message asking how long it would take until he arrived (TT2 Ref. 42).

58.    At approximately 1106 hours, **CESAR** called UM4990 and told him he is ten minutes away (TT2 Ref 044). UM4990 told **CESAR** he will be there soon. At approximately 1115 hours, **CESAR** received another call from UM0438 (TT2 Ref. 45). UM0438 restates to "just give the thirty-if he doesn't give you anything, just give him the money." UM0438 adds "You're going to coordinate the return. I'll give up your number so you can coordinate everything."

59.    At approximately 1125 hours, UM4990 texted that "I am here." (TT2 Ref. 47). In a subsequent call, **CESAR** confirmed that he was in a white Explorer and UM4990 confirmed that he was in a white Acura (TT2 Ref. 48). Electronic surveillance confirmed that **CESAR** was in the area of "2332 W Northwest Hwy, Dallas, TX 75220" consistent with these communications.

60.    At approximately 1306 hours, UM0438 advised **CESAR** he will be getting a phone call soon from a 956-area code and that person will be bringing him money (TT2 Ref. 51). UM0438 instructs **CESAR** to meet at the same area where he was given the "stuff" and he delivered the money. UM0438 advises **CESAR** will be given twenty (20) and of those 20, he will give away fifteen (15). **CESAR** adds that he understood, and he will be expecting their call so he can pack up the stuff and take it to them (TT2 Ref. 051).

61.    At approximately 1408 hours, **CESAR** tells UM0438 the guy with the money called him and **CESAR** provided him an address to meet, but that the other one has not called yet (TT2 Ref. 53).   Shortly thereafter, at approximately 1420 hours, **CESAR** received a call from UM4990 (TT2 Ref. 54). UM4990 says that he is calling on behalf of "el viejon" (the old man) and that he would take care of him in one hour for the shirts." Based on my training and experience, I believe that the reference to "shirts" is code for the methamphetamine that UM0438 indicated **CESAR** would be picking up. Immediately after, **CESAR** called UM0438 and confirmed that he had received the call above (TT2 Ref. 55). **CESAR** further stated that he already provided the address and that he booked a hotel in the area so that everything would be nearby (TT2 Ref. 055).   Tracker data for the white Explorer showed it to be in the area of the Comfort Inn and Suites at 1521 Inwood Rd, Dallas, Texas, during that time.

62.    At approximately 1509 hours, **CESAR** called UM0438 and advised that the guy with the money arrived, but he is still waiting for the other guy (TT2 Ref. 56). UM0438 advised **CESAR** he will call the other guy.   He also told **CESAR** that he should tell the guy with the money to wait and that he would meet him later.

63.    At 1533 hours, UM0438 advised **CESAR** to call the other guy (UM4990), the one with the "stuff" and "tell him you are ready" (TT2 Ref. 63).

UM0438 also told **CESAR** to tell the "other man" (i.e., the one with the money) that they were "packing the stuff up now." As directed, **CESAR** called UM4990 at 1534 hours and told him he was ready (TT2 Ref. 64). UM4990 affirmed and says he will send the address which he later does: "2829 W Northwest Hwy Dallas, TX 75220" (TT2 Ref. 67). This is very close to the same place where **CESAR** previously met with UM4990 earlier. By this time, law enforcement was able to supplement its electronic surveillance with some physical surveillance.

64.     At approximately 1600 hours, **CESAR** called UM4990 and advised him that he was at the meeting location (TT2 Ref. 78). UM4990 told **CESAR**, "The same car will be there. The trunk will be unlocked, put it in there." UM4990 added, "There's a yellow box, the clothes are in there." **CESAR** confirmed to UM990 that he had it and the call ends. Surveillance at this time was able to be established at the address **CESAR** received from UM4990, which was a business parking lot. An HSI Dallas agent observed **CESAR's** Explorer and reported seeing **CESAR** take a large yellow box/tote from the trunk of the previously observed white Acura and placing it in his Explorer.

65.     Later, at 2113 hours, electronic surveillance showed both **CESAR's** Explorer and **CERVANTES's** Tahoe arrive at 2000 S. Independence back in Oklahoma City. It appears **CERVANTES** and VALDEZ (driver) exit the Tahoe and **CESAR** and another male (driver) exit the Explorer. All four

enter in the house. One male appeared to be holding a bag which he placed inside a large toolbox on the front porch. Based on the intercepted communications, surveillance, and my experience, I believe that **CESAR** picked up the 20 kilograms of methamphetamine directed by UM0438 and subsequently delivered a portion of that to others in the Dallas area.[15] **CESAR** then kept a portion of the methamphetamine and brought it back up to the Oklahoma City area for further distribution.

### Three March 15, 2021 Drug Deliveries

66. On March 15, 2021, **CESAR** begins a series of incoming and outgoing calls with UM0438 in which several drug deals are coordinated over the remainder of the day. In the first call, UM0438 asks **CESAR** how the "work" was and asks **CESAR** to send pictures (TT2 Ref. 125). Again, based on my training and experience, the term "work" is code for drugs and in this case methamphetamine. UM0438's request for pictures of the work and setting up multiple drug deals through **CESAR** corroborates the fact that **CESAR** had

---

[15] The following day, a dispute arose about the amount of money involved. **CESAR** received a call asking how much the were the "documents" from Oklahoma (TT2 Ref. 91). **CESAR** confirmed that it was "90" That same person later called back and said that 10 was missing (TT2 Ref. 93). **CESAR** responded that the packages came sealed so there should not be anything missing. **CESAR** also discusses this issue with UM0438 (TT2 Ref. 98) who ultimately tells **CESAR** to stop answering their calls (TT2 Ref. 100).

just picked up a load of methamphetamine the previous day. Later, at approximately 1521 hours, UM0438 asked **CESAR** to provide him an address so that **CESAR** can deliver "one piece" and clarifies that he means "one whole piece" (TT2 Ref. 130). Based on my training and experience the term "one whole piece" is code for one kilogram of methamphetamine. In a later call at 1638 hours (TT2 Ref. 134), UM0438 asked how far out **CESAR** is from the address he provided. **CESAR** answered he was ten minutes away.

67. At approximately 1651 hours, pole camera surveillance at S. Independence records **CESAR** and **CERVANTES** arriving in a green Toyota Tundra truck with an empty trailer. **CESAR** exits the driver's side, **CERVANTES** the front passenger side, and Rosa VALDEZ the back passenger side. During that time a blue Chevy truck parked in the driveway was being hauled off by a wrecker service. **CESAR** appears to sign for the wrecker service receipt. At approximately 1703 hours, UM0438 called **CESAR** and told him that the customer is ten minutes away (TT2 Ref. 135). At that time electronic surveillance recorded **CESAR** on a cell phone standing in the driveway of S. Independence by the maroon Chevy Tahoe, while **CERVANTES** and VALDEZ stand in the front yard. When **CESAR** asked, "Is he going to give me something or just hand over the piece?" UM0438 responded that **CESAR** will be given "fifty-eight hundred". Based on the foregoing and consistent with my training and experience, I believe that **CESAR** and UM0438 coordinated the delivery

52

of 1 kilogram of methamphetamine for $5,800 and that the delivery was coordinated through a courier working for **CESAR**.

68.    Later, on March 15, 2021 at approximately 1942 hours, UM0438 asked **CESAR** whether he "has a guy over there who can deliver one – another unit?" (TT2 Ref. 146). **CESAR** advised he will send someone to the same address. At approximately 2005 hours, **CERVANTES's** Chevy Tahoe returns to S. Independence. The male driver and male passenger exit and enter the residence. At approximately 2128 hours, UM0438 called **CESAR** and told him that that the customer was 7 minutes away and will be in a black Mercedes (TT2 Ref. 151).   In another call a few minutes later, UM0438 asks **CESAR** what car his guy is driving, and **CESAR** informs him it is a red Tahoe (TT2 Ref. 151).   In another call at 2133 hours, UM0438 advises **CESAR** to make sure his guy gets $5,900 from the guy and that he should not hand over the product if the money is not right (TT2 Ref. 155). At approximately 2145 hours a male exited S. Independence and departed in the maroon Chevy Tahoe.

69.    Consistent with the foregoing communications, electronic surveillance of the Tahoe showed that the vehicle left 2000 S. Independence Ave., Oklahoma City, Oklahoma at approximately 2146 hours.   Physical surveillance of the Tahoe was also established, and law enforcement observed the Tahoe drive to a business called the Safari Club, located at Newcastle Road in Oklahoma City.   Once the Tahoe arrived, law enforcement observed the

driver of Tahoe park next to a black Mercedes, bearing Oklahoma tag KQD-916, registered to Calista **CLARK**. Law enforcement observed a female exit the driver's seat of the black Mercedes and enter the Tahoe. Approximately three minutes later the female exited the Tahoe and returned to the Mercedes. Based on my training and experience, the length of time that the female was in the Tahoe is consistent with the duration of a drug transaction. Both vehicles then drove to a gas station at 3302 SW 29 Street, Oklahoma City, Oklahoma. The vehicles parked at the gas pumps next to one another. The Tahoe later exited the gas station and returned to 2000 S. Independence Ave. arriving at approximately 2219 hours.

70. A short time after the black Mercedes left the gas station. An Oklahoma City police officer conducted a traffic stop of the Mercedes based on an observed traffic violation. Inside the vehicle were three occupants, Calista **CLARK** (driver), David Sanchez (front seat passenger) and Dean Mack (later identified to be Dean **MAXEY**). While gathering information from **CLARK**, the officer noted several signs of nervousness and unusual behavior. For instance, when **CLARK** was asked basic questions, like who the other occupants of the car were, **CLARK** would ask the other occupants before answering. Another officer who had arrived on the scene to assist observed the barrel of a firearm that **MAXEY** appeared to be sitting on. All the vehicle occupants were removed from the Mercedes for officer safety. After a

54

subsequent search of the vehicle, officers confirmed **MAXEY** was sitting on a Taurus 9mm handgun with a loaded, extended magazine. OCPD officers also discovered a loaded 9mm magazine in his right front pants pocket. **MAXEY** admitted he was a convicted felon in Florida. Officers also located a large Ziploc bag on the backseat floorboard where **MAXEY** was sitting. The zip-loc bag contained approximately three pounds six ounces (3 lb., 6 oz) of a crystal substance that field tested positive for methamphetamine. Three small bags of methamphetamine weighing approximately thirty-two (32) grams were also discovered under the front driver seat where **CLARK** was seated. All three subjects were detained and arrested by OCPD. Consistent with the conversation outlined above and in my training and experience, I believe that **CESAR** and UM0438 coordinated the delivery of at least 1 kilogram of methamphetamine to **CLARK/MAXEY**, and that methamphetamine was delivered by one of **CESAR's** associates.

71. At approximately 2300 hours, UM0438 asks if **CESAR** can deliver an "L" right now (TT2 Ref. 164). **CESAR** affirms and UM0438 asks if he can send a different address because he does not want to use the same address they used before. At approximately 2336 hours, **UM0438** confirms that his customer would be arriving in 8 minutes, driving a gray/silver Impala, and would be paying $2,900 (TT2 Ref. 169). Based on my training and experience, an "L" is code for one pound and $2,900 is consistent with the price for one

pound of methamphetamine. At 2342 hours, UM0438 confirms his customer would arrive in 2 minutes and **CESAR** acknowledges that his guy would be in the same red Tahoe (TT2 Ref. 170).[16]  At 0003 hours on March 16, 2021, **CESAR** confirms that the final deal of the day was done, and that **CESAR** was counting the money (TT2 Ref. 171).

### March 23, 2021 Methamphetamine Deliveries

72.    On March 23, 2021, at approximately 1346 hours, **CESAR** called UM0438 (TT2 Ref. 496).  UM0438 told **CESAR** they need to exchange one pound of methamphetamine from a third party at a hotel. UM0438 requested that **CESAR** arrange the hotel location, and to send him photos of the one pound they are exchanging for and photos of the "work" they had just received. Intercepted calls and electronic and physical surveillance had documented **CESAR** travelling to Dallas in the previous few days and obtaining at least 6 kilograms of methamphetamine

73.    At approximately 1458 hours, **CESAR** called **RIOS** and instructed him that the third party (i.e., the customer) should be there at 3:30 and that **RIOS** should make the delivery at 3:35 (TT2 Ref. 504). **CESAR** tells

---

[16]    Even though **CESAR** indicated that his driver would be delivering the methamphetamine in the same Tahoe, **CERVANTES's** Tahoe, electronic surveillance showed that the Tahoe did not move during this time period and that it is likely another person delivered this pound for **CESAR**.

**RIOS** that he has seen what is going to be delivered and that it would be in a "gift bag". Law enforcement had previously observed **CESAR** and his associates using gift bags to transport and deliver drugs.

74. At approximately 1526 hours, **CESAR** calls **RIOS** back (whom he refers to as "Felix" on several occasions) and the two men discuss the delivery **RIOS** is planning to make (TT2 Ref. 508). **CESAR** tells **RIOS** that he will be making an exchange, and **RIOS** will take "one" (1) and get "one" (1) back from the customer he is meeting. **CESAR** then instructs **RIOS** to "bring me the one they're going to give you." **CESAR** adds that the one **RIOS** is delivering is in a bag and **RIOS** reaffirms, "okay, in the Ziplock." **CESAR** reminds **RIOS** to check to see if it is wet. **RIOS** confirms that it looks fine.

75. Later, **CESAR** informed **RIOS** that the person was coming in a black truck (TT2 Ref. 513). **CESAR** also confirmed to UM0438 when the transaction was complete (TT2 Ref. 515). Based on the foregoing and in my training and experience, I believe that the foregoing conversation reflected a deal that UM0438 coordinated through **CESAR** to deliver one kilogram of methamphetamine and exchange it for another kilogram previously delivered to the same customer. The reference to checking for wetness is another indicator that the Fonseca DTO is converting liquid methamphetamine to crystal methamphetamine (TT2 Ref. 508).

76.   On the same date, at approximately 1817 hours, **CESAR** called (405) 506-5969, a phone number believed to being used by "Lobo" (TT2 Ref. 526).   During the brief phone call, **CESAR** told Lobo, "Hey, I need you to come back bro, because I'm going to send you to deliver something." Lobo affirms and the conversation ends.  Immediately following that call **CESAR** calls Lobo back and tells him to "go to JUANITO's (**CERVANTES's**) house" and "bring what's left in the front of the... what's in the front of the car" (TT2 Ref. 527). Lobo affirmed.

77.   At approximately 1819 hours, **CESAR** called **CERVANTES** and asked where they should send "Lobito" to deliver "four pieces." "Lobito" ("little wolf" in Spanish) is a nickname used to refer to the same individual identified as Lobo.   Based on the foregoing and in my training and experience, I believe the reference to "four pieces" is code for four kilograms of methamphetamine and that **CERVANTES** and **CESAR** were preparing for a drug delivery later in the day.  **CERVANTES** suggested that **CESAR** send Lobo to the Hooters restaurant on Interstate 240 (TT2 Ref. 528).  Later, Lobo called **CESAR** and asked where he should go (TT2 Ref. 529).  **CESAR** responded that he should bring the "stuff" to **CESAR's** house.  In my training and experience, "stuff" here means drugs, specifically methamphetamine.  Surveillance was established at **CESAR's** residence and officers observed the individual believed to be Lobo arrive driving a Chevrolet Silverado and enter the

residence at approximately 1910 hours. At approximately 1911 hours, surveillance teams watched as Lobo exited the residence carrying a large gift bag and get into in a black Mercedes.[17] He then travelled without stopping to a parking lot adjacent to the Hooters restaurant at 2109 W. I-240 Service Road, Oklahoma City, Oklahoma.

78. At approximately 1914 hours, UM0438 called **CESAR** and told him the female (customer) was waiting at Hooters (TT2 Ref. 538). **CESAR** told UM0438 that his guy is there also and driving a Mercedes. At approximately 1925 hours the surveillance team observed a black Mercedes park next to a black Denali pick-up truck. Officers observed a female take the large gift bag, the same one previously seen being carried out of **CESAR's** residence by Lobo, from the black Mercedes and put it into her vehicle. The surveillance team observed the female get into the black Denali and drive away. Based on the foregoing and in my training and experience, I believe that Lobo delivered 4 kilograms of methamphetamine to the female customer in the Hooter's parking lot.

---

[17]     In a call at 1844 hours, **CESAR** and **CERVANTES** discussed whether Lobo could borrow a car because the muffler on Lobo's truck just came off and that the Tahoe (**CERVANTES's** usual car) was getting its windows fixed (TT2 Ref. 530). **CESAR** called again and told **CERVANTES** that Lobo can use the Mercedes (TT2 Ref. 533). He further clarified that Lobo should just leave his truck at **CESAR's** house.

79.    At approximately 1735 hours, officers conducted a traffic stop on the black Denali and identified the female occupants of the vehicle.  No search or arrests were made that time.

80.    At approximately 1939 hours, **CESAR** called Lobo and told him that he needed to go hide the Mercedes because the female he had just met "got busted" right after she left the Hooters (TT2 Ref. 542).  Lobo affirmed and said he would leave the car at his grandparents' house.  Shortly after that call, at approximately 1958 hours, UM0438 called **CESAR** and told him everything is good, and that the female was only pulled over for a traffic violation.  **CESAR** informed UM0438 that he had told his people not to do anything else that night (TT2 Ref. 545).

### Fentanyl Delivery to WISBY On March 29, 2021

81.    On March 21, 2021, at approximately 1648 hours, monitors intercepted a call between **CESAR** and **JOSE** (TT1 Ref. 2170; TT2 Ref. 382). During the call they discuss "Javion", later identified as **WISBY**, owing money and that they usually give "Javion" "300 of them" and that **WISBY** owes them $1,900.  Based on the foregoing and in my training and experience, I believe that **WISBY** is a customer of the **JOSE** and **CESAR's** who primarily purchases fentanyl pills. Following this call a subsequent call was intercepted in which **CESAR** and **JOSE** agreed to meet near NW 15th and Pennsylvania in Oklahoma City.  Surveillance agents set up physical surveillance in this area in

response to the intercepted calls. Agents observed a black male, later identified as **WISBY**, standing outside a silver Mercury Marquis meeting on the street with both **JOSE** and **CESAR**.

82.   Following this meeting, the vehicle was stopped for a traffic violation by the Oklahoma City Police Department. The patrol officer identified the driver as Sierra Harris and the passenger as **WISBY**. Harris provided the patrol officer with a home address of "7145 S Santa Fe Apt. H." in Oklahoma City, which is an address for the Remington apartment complex.

83.   On this same date at approximately 1931 hours, law enforcement intercepted a call between **CESAR** and **JOSE** (TT1 Ref. 2177; TT2 Ref. 390). **JOSE** told **CESAR** that "Javion" (**WISBY**) was stopped by the police. **CESAR** then told **JOSE** not to come out of his house anymore that night. Following this call at approximately 2043 hours, monitors intercepted a call between **CESAR** and an unidentified male (UM) (TT2 Ref. 398). During this call **CESAR** tells the UM not to be "going out" because the "drug enforcement is picking people up". **CESAR** also tells the UM to make sure the UM does not have any of the "little blue ones", to put them in the safe, and not to accept any more "orders". Based on the foregoing and in my training and experience, I believe that **WISBY** is a fentanyl pill customer and that the UM in this last call is one of the people who is in charge of handling fentanyl pill distribution for **CESAR**.

84.    **WISBY's** role as a fentanyl customer of the Fonseca DTO was soon confirmed. On March 29, 2021 beginning at approximately 1150 hours, law enforcement intercepted a series of calls between **JOSE** and **CERVANTES** on TT1 (TT1 Ref. 2547, 2548, 255, 2568, 2569, 2570, 2571). During these calls **JOSE** and **CERVANTES** agree to give **WISBY** "500" and discuss that **WISBY** still has 100 but has $2,000 on hand.  At approximately 1412 hours, **JOSE** called **CERVANTES** again (TT2 Ref. 2547). **CERVANTES** told **JOSE** that **CESAR** said they will have to wait until later that tonight because **CESAR** is not up to doing anything at the moment.[18]

85.    At approximately 1916 hours, **JOSE** called **CERVANTES** again (TT2 Ref. 2570). During this call **CERVANTES** directs **JOSE** to travel to "Toro" or "Torito's" house. Agents had previously identified "Toro" as a moniker used by **RIOS** for himself on his Facebook page. **CERVANTES** tells **JOSE** that "Toro" will have them ready, and that **CERVANTES** got the "green light" (from **CESAR**).

86.    At approximately 1930 hours, surveillance observed **JOSE's** black Hummer, and a red Chrysler 300 arrive at 2001 NW 15th Street, Oklahoma City, Oklahoma. Agents observed **JOSE** exit the Hummer and **CERVANTES** exit

---

[18]    The prior night, **CESAR** had been arrested by OCPD and was apparently reluctant to do anything drug related immediately following that arrest.

the Chrysler 300. Agents then observed **RIOS** arrive in a white Chevy "low-rider" truck. All three males went in and out of the detached garage of the residence. At approximately 1950 hours, **JOSE** left the residence in his Hummer. Surveillance followed **JOSE** to his address at the time, 2140 NW 31st Street, Oklahoma City, Oklahoma. At approximately 2015 hours, agents observed **WISBY's** silver Mercury Grand Marque leave the Remington apartment complex and travel to **JOSE's** residence, arriving at approximately 2030 hours. At approximately 2032 hours, agents observed a male passenger, believed to be **WISBY**, exit the Mercury Grand Marquis and enter the house. At approximately 2035 hours, agents observed the Mercury Grand Marquis depart **JOSE's** residence and travel back to the Remington apartments. Based on the foregoing and in my training and experience, the short duration of **WISBY's** time inside **JOSE's** house is consistent with a drug transaction and I believe that **JOSE**, **CERVANTES**, **CESAR,** and **RIOS** collaborated to obtain and deliver 500 fentanyl pills to **WISBY** in exchange for $2,000 as reflected in the wire communications.

87.     On March 30, 2021, OCPD executed a search warrant at **WISBY's** residence, 7145 S. Santa Fe Ave, Apt. H, Oklahoma City, OK. During the search warrant, OCPD officers encountered **WISBY**, his girlfriend Sierra Harris, and a minor child. As a result of the search warrant, OCPD officers discovered approximately 54 grams of blue pills marked with "M-30" (believed

to be counterfeit Oxycontin, containing fentanyl), approximately 521 grams of marijuana, \$4,379 in U.S. currency and a set of measuring scales with marijuana residue. While lab reports on the suspected fentanyl pills are still pending, based on my training and experience, these pills are similar in size and appearance to the other M-30 pills which have been distributed by the Fonseca DTO. M-30 pills seized from prior transactions with the Fonseca DTO have been tested positive for the presence of fentanyl and therefore, I believe that these pills seized from **WISBY** do contain fentanyl and will test positive for the presence of fentanyl.

88.    **WISBY** and Harris were detained for questioning by OCPD. During a post-*Miranda* interview, **WISBY** told investigators that they would find the "M-30" pills when they searched the apartment. **WISBY** also told investigators that he had been working with some people who had provided him with the pills. **WISBY** provided OCPD with consent to search and download the contents of his phone. Data retrieved from **WISBY'S** phone documented multiple pictures of little blue pills, similar in appearance as the "M-30" pills seized from his apartment.

89.    Later on March 30, 2021, law enforcement intercepted a call from **JOSE** to **CESAR** at approximately 1252 hours (TT1 Ref. 2596). **CESAR** had switched phones by this point and was now using (405) 764-3380 and all activity on TT2 had ceased. In the call, **JOSE** told **CESAR** about the arrest of

WISBY. **JOSE** advised **CESAR** that **WISBY** was arrested, and the police "raided" his house. **JOSE** also told **CESAR** "you need to get everything out of... of this guy's...[trailed off]" and "they followed him yesterday when he picked up the stuff from... my place." Moments later at 1258 hours, **JOSE** called **CERVANTES** (TT1 Ref. 2597). During this call **JOSE** advised **CERVANTES** that **WISBY** had been arrested and had been followed by the police. **JOSE** told **CERVANTES** that the police took **WISBY's** phone, but that **JOSE** did not "have anything" and "they can't do nothing to me if I don't have anything on me." **CERVANTES** responded that **JOSE** should, "Delete all your messages, dude." The two men go on discussing **WISBY's** arrest and **JOSE** stated, "what I need is for you (**CERVANTES**) and "Toro" (**RIOS**) take everything out of there, man." **JOSE** advised **CERVANTES** to take it to storage. **JOSE** also said that he was going to change his phone.

90.     Finally, at 1337 hours, **JOSE** called **CESAR** (TT1 Ref. 2604). **JOSE** told **CESAR** that he was on the phone with "this guy's girlfriend" and was going to "put her on speaker." **JOSE** refers to the female as "Sierra" (**WISBY's** girlfriend Sierra Harris). Sierra Harris told **CESAR** that the police "had taken pictures of the room it was in, and everything" and that "every time we pass, you know, pass your house, they stopped us." Sierra then drops off the phone call and **CESAR** returns to talking to **JOSE**. **CESAR** asked **JOSE** how many times **WISBY** had picked up from **JOSE's** house and **JOSE**

responds, "just two times, man." Finally, the two discuss how you can erase the contents of an iPhone.

91.   **JOSE** then called Sierra Harris again (TT1 Ref. 2605). **JOSE** asked Sierra whether she knows what they took. Sierra responded "yeah, yeah, he had those five hundred pills in the jar" and "they took it yea."

92.   By March 31, 2021, all outgoing communications for TT1 and TT2 had completely ceased. In light of that fact, all further interceptions ceased though the investigation continued.

**CONCLUSION**

93.   Based on my training and experience, and the foregoing information, I submit that there is probable cause to believe that **CESAR ALEJANDRO FONSECA-ECHAVARRIA ("CESAR"); JOSE ANDREAS FONSECA-ECHAVARRIA a/k/a "Jay," "Pony," "Andres" ("JOSE"); JUAN ANTONIO CERVANTES-ONTIVEROS a/k/a, "Juanito"; JEROME THOR CAMPBELL (a/k/a, "Thor", "Tulsa", "Old School"); OSVALDO CALVILLO-OROPEZA (a/k/a, Soldado); FELIX ANTONIO CAMPA-RIOS (a/k/a, "Toro"); CALISTA CHARMAINE CLARK, DANTE MAXEY** and **JAVION JARREL WISBY**, knowingly and intentionally conspired together, along with other persons both known and unknown, to possess with intent to distribute and to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a

Schedule II controlled substance, 1,000 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, and 400 grams or more of a mixture or substance containing a detectable amount of N–phenyl–N–[1–(2–phenylethyl)–4–piperidinyl] propanamide (fentanyl), a Schedule II controlled substance, from in or about March 2020 and continuing thereafter until on or about April of 2021, in violation of 21 U.S.C. § 846.

RYAN BELCHER
Special Agent
Homeland Security Investigations

Sworn to before me this 8th day of September, 2021.

SHON T. ERWIN
United States Magistrate Judge
Western District of Oklahoma

67